IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

HELENA DIVISION

*******

DONALD BOSSE,                                    CV 07-12-H-CCL

       Plaintiffs,

-v-                                              <u>OPINION & ORDER</u>

MICHAEL CHERTOFF, Secretary
Department of Homeland
Security; and
UNITED STATES CITIZENSHIP
AND IMMIGRATION SERVICES,
f/k/a United States
Immigration and Naturalization
Services, a Bureau of the
Department of Homeland Security,

       Defendants.

*******

Before the Court are the parties' cross-motions for summary
judgment. The motions came on for hearing on March 6, 2008. The
Plaintiff was represented by Nathan Davidovitch, and the Federal
Defendants were represented by AUSA George Darragh. Having heard
the parties' arguments and considered the briefs, affidavits, and
other exhibits presented by the parties, the Court is prepared to
rule.

I.   <u>Background</u>

Plaintiff Donald Bosse ("Bosse") is a resident of Helena, Montana.  From 1997 through July, 2002, Bosse was employed by Defendant United States Citizenship and Immigration Service ("INS" or "the Agency") as an Immigration Inspector at an airport in Calgary, Alberta, Canada.  On July 29, 2005, the INS issued its Final Decision to reject Bosse's complaints of disability discrimination.  This litigation was filed shortly thereafter.

Bosse's Amended Complaint alleges that the INS violated the Rehabilitation Act of 1973, 29 U.S.C. § 791 *et seq.*, when it discriminated against him because of his disability or perceived disability and failed to grant him reasonable accommodations. Bosse's second claim for relief asserts that the INS breached its contract with him when it violated its own internal policies set forth in the INS *Supervisor's Guide to Discipline*.  Finally, Bosse's third claim for relief asserts a claim of promissory estoppel in that he detrimentally relied on the INS's alleged promise that if he had a valid excuse for an absence he would not be disciplined, and any failure on his part to follow proper leave procedures might result in discipline but not suspension or

2

termination of employment.

During the course of his employment with the INS, Bosse
filed (a) a claim of discrimination in February, 2002, with the
Equal Employment Opportunity Commission ("EEOC") (for sick-leave
restrictions related to on his physical disability), (b) a claim
in March, 2002, with the Office of Workers' Compensation Programs
(for job-related stress and depression), and (c) a union
grievance in August, 2002 (for job termination).  The Court will
review the general chronology of events.

Bosse claims his health began to suffer in 1998, although he
did not know the cause of his ill health.  Bosse depleted his
entire sick leave allowance during eight pay periods in 1998 and
again in one pay period in 2001.  At some point prior to
April 21, 2007, however, the INS began to notice a pattern to
Bosse's absences, and an audit of Bosse's absences showed that he
was absent immediately before or after scheduled days off on 17
out of 23 occasions.  Additionally, Bosse was not submitting
written requests relating to his sick leave as required by the
Agency.

Matters came to a head when Bosse was absent from work due

to an attack of gout from Wednesday, March 28, 2001, through
Monday, April 16, 2001.  (Exhibit A-6 at 1, Def.s' Response in
Opposition to Plaintiff's Motion for Summary Judgment,"
hereinafter referred to as Ex. A-__.)  Shortly after Bosse
returned to work, the INS required him to formally request sick
leave in writing and to submit a doctor's medical certificate
justifying his recent prior absence by April 30, 2001.  (A-6 at
2.)  On April 21, 2001, the INS issued Bosse a Leave Restriction
Letter, putting Bosse on notice that his prior use of sick leave
was unacceptable to the Agency and providing Bosse with a set of
instructions for his future use of sick leave.  The Leave
Restriction Letter explained to Bosse that the reasons underlying
the action were as follows:

1.   You have been a full time employee of the U.S.
     Immigration & Naturalization Service for almost 4
     years.  During this time period you have earned a total
     of 364 hours of sick leave.  During this same time
     period, you have used a total of 376 hours of sick
     leave.
2.   According to the attached audit, of the 23 separate
     instances that you have used sick leave, 17 instances
     have been before or after days off, including Sundays
     you did not work.
3.   For the second time in your career with the U.S.
     Immigration & Naturalization Service, you have depleted
     your balance of sick leave.  This has resulted in a
     negative sick leave balance during pay period 13-21,

        1998, and a zero balance in Pay Period 6 of 2001.

4.    You have not filed SF-71's for you [sic] sick leave absences as required, which we will need for this and all future absences.

5.    You also need to familiarize yourself with the guidelines as they relate to the request of sick leave. Calling after hours when P.D. [Port Director] Garner and myself are not on duty is not the proper procedure to follow.  You need to call during duty hours and speak to either P.D. Garner or myself to request sick leave.

(Ex. A-3 at 1.)

The Leave Restriction Letter required Bosse to provide a satisfactory medical certificate for all sick leave or leave without pay due to illness or incapacitation within three days after return to work or be counted as absent without leave.  (A-3 at 1.)  A satisfactory medical certificate was defined as (1) a written statement, (2) signed by the employee's physician, (3) certifying to the examination, treatment or period of disability, (4) summarizing the diagnosis and prognosis of the illness, and (5) clearly showing the dates (or hours if less than one day) of incapacitation.  (A-3 at 1.)  By a subsequent memorandum, dated April 20, 2001, Port Director Garner ordered Bosse to submit an SF-71 for the immediately previous absence (which was from March 28 through April 16, 2001) and also to submit a medical

5

certificate for the same, both to be submitted by April 30, 2001.

Bosse never submitted a medical certificate containing the detailed information requested by the INS for the March 28 through April 16, 2001 absence.  Instead, on May 10, 2001, ten days after the April 30 deadline, Bosse submitted a one-sentence doctor's note written on a prescription pad that excused Bosse from work from March 28 through April 16, 2001.  The INS rejected this doctor's note as being insufficient and assigned Bosse the status of Absent Without Official Leave ("AWOL") for 107 hours of work time. (A-6 at 1.)

In July, 2001, Alan Puckett, Deputy District Director, INS, proposed giving Bosse a 14-day suspension as a consequence for having been assigned the AWOL status, and gave Bosse 10 days to consider the proposed discipline and respond orally or in writing, with or without a representative's assistance.  (A-6.) Bosse responded in writing with "numerous emails/facsimile copies dating from April 18 through August 5, 2001."  (A-6 at 4.)  On August 9, 2001, District Director Harry Thomas decided that the proposed discipline should be implemented.  (A-6 at 4-5.)  At both levels, the reasons given for the discipline were (1)

6

excessive unauthorized absence, and (2) delay in carrying out the order of a superior (*i.e.*, the failure to timely provide the requested medical certificate in the format requested).  (A-6 at 1-2.)  In his August 9 letter, District Director Thomas informed Bosse that his 14-day suspension would begin at the close of business on August 25, 2001.  This letter notified Bosse that if he objected to this action based "on discrimination due to race, color, religion, national origin, sex, age or disability," he "should consult a Service Equal Employment Opportunity Counselor **within forty-five (45) days of the effective date of [his] suspension [August 25, 2001].**"  (A-6 at 5, emphasis in original.)

About one week after completion of his suspension, Bosse did not appear for duty on September 18, 2001.  In response, Port Director Dennis Garner issued a Leave Restriction Compliance memorandum to Bosse directing Bosse to obtain a medical certificate to justify that absence.  (A-11 at 4.)  Garner noted that Bosse had not notified the Agency of his illness and his need for sick leave, as was required by the April 21 Leave Restriction Letter.  Bosse submitted a prescription-pad doctor's note, dated September 17, 2001, from Dr. Jacob Jung, a

psychiatrist, that states "Please excuse from work until Sept 24/c/ due to medical reasons."  (A-11 at 6.)

During the second week of September, 2001, Bosse was diagnosed with Type II Diabetes Mellitus.

On October 19, 2001, the Agency canceled Bosse's annual hunting vacation.

On January 22, 2002, Bosse did not report for work, allegedly due to his doctor's instructions for the purpose of managing Bosse's stress and depression.  (A-20 at 3.)  On January 25, 2002, the Agency placed Bosse on AWOL status.  On February 1, 2002, Port Director Dennis Garner ordered Bosse in writing to report to work the next day or present (in person) a letter from a doctor justifying his absence and relinquish his office keys and airport identification badge, until medically released to return to work.  (A-11 at 3.)  Bosse admits that he did not do as directed by Port Director Garner.  (A-1 at 35 (Response to Request No. 7).)  Although he neither reported to work the next day nor presented written documentation from a doctor the next day, Bosse explains that he did provide a doctor's note at a later date.  (A-1 at 35.)

As best this Court can determine from the record, Bosse never returned to work.  Instead, Bosse filed a complaint with the EEOC three weeks later, on February 24, 2002.  (A-11 at 1.) The next month, in March, Bosse filed a claim with the Office of Workers' Compensation Programs, apparently for job-related stress and depression.  (A-14 at 1.)  On March 23, 2002, Bosse submitted a written request for sick leave, with a photocopied prescription-pad doctor's excuse from Dr. Jung.  (A-7 at 2.)

On May 15, 2002, Deputy District Director Alan Puckett proposed that Bosse's employment be terminated for the reason that Bosse had again been AWOL and had again failed to follow orders.  On July 23, 2002, after considering Bosse's written submissions on the proposed termination, District Director Harry Thomas decided that Bosse should be removed from his position at the close of business on July 27, 2002.  (A-7 at 1.)  Director Thomas' July 23 letter notifying Bosse of his impending termination also informed Bosse that he could contest the action by (1) filing a grievance under his collective bargaining agreement and requesting arbitration within 15 days after termination, (2) appealing his termination to the Merit Systems

Protection Board within 30 days after termination, or (3) consulting an EEOC counselor within 45 days of his termination. (A-7 at 3-4.)  The letter also warned Bosse that by selecting one of the three options, he would foreclose the other two options; the letter provided Bosse with the name and telephone number of an INS Labor Relations Specialist located in Dallas, Texas, who could provide further information to him.  (A-7 at 4.)

Bosse failed to contact an EEOC counselor regarding his July 27, 2002, termination.

On August 6, 2002, Bosse faxed an amendment to his 2001 complaint to the EEOC.  (A-4.)  On August 19, 2002, the EEOC issued a responsive letter to Bosse that restated the issues of Bosse's EEOC complaint, as amended.  (A-17.)  The issues before the EEOC were now to be (1) INS's undue delay in processing Bosse's workers' compensation claim, (2) the leave restrictions imposed since April 21, 2001, (3) INS's failure to forward to Bosse his DFAIT[1] card, and (4) INS's failure to afford Bosse

---

[1]  A "DFAIT card" is a pre-clearance document used by INS inspectors traveling between the United States and Canada.  It is issued by the Canadian government, but is a relatively new document not always recognized by Canadian Customs employees. "The card is not a necessity, as INS employees are also issued

Family and Medical Leave Act.  (A-17 at 1.)  Bosse stated that he
did not want to amend his EEO Complaint to incorporate a claim
that he was wrongfully discharged, explaining it as follows:

> I have recently been fired.  I am not at this time
> bringing this issue to this table in efforts to use one
> on [sic] my legal remedies to appeal the decision.  I
> am bringing the details to your attention, as they are
> relevant as evidence, which further demonstrates the
> treatment I have endured at my workplace.  I reserve
> the right to file a complaint at a later date regarding
> my being fired should I decide on this direction.

(A-4 at 2.)

On August 23, 2002, Bosse replied to the EEOC's statement of
the issues and reiterated that, while he wanted to have his job
restored as a remedy, he actually wanted to use the union
grievance procedure to directly challenge his termination.  (A-
15.)  Bosse explained that he did not want the amendment to his
EEO Complaint to

> include my being removed from the serve as an issue to
> be investigated as part of the Amendment.  I was
> instructed by an attorney to request this as having the
> Union Arbitrate the matter is supposed to be more
> timely.  Being in the position, which I am in at this
> time, I must pursue the Union option.

---

diplomatic passports and work authorizations, which provide
clearance on border crossings." (Report of Investigation, A-14 at
12.)

11

(A-15.)  Thus, Bosse chose to grieve his termination by means of a union arbitration procedure due to his belief that the grievance and arbitration process would be quicker than an EEO process.

On August 15, 2002, Bosse filed a grievance with his union and invoked his right to arbitration regarding his July 27 termination.  (A-20.)  An evidentiary hearing was held in November, 2002, and in January, 2003, the arbitrator ruled in favor of the INS.

The next month, in February, 2003, Bosse amended his EEOC Complaint to allege an incident of reprisal on November 20, 2002, when District Director Thomas allegedly attempted to persuade the arbitrator to cancel the November 21, 2002, hearing (which did in fact take place).

In May, 2004, an EEOC Administrative Judge denied Bosse's request for a hearing due to his dilatory conduct in meeting the EEOC's deadlines for prosecuting his complaint, and the Administrative Judge remanded Bosse's EEOC complaint back to the Agency for a final decision without a hearing.  (A-19.)  The Agency issued its final decision on July 29, 2005.  (A-20.)

Because several claims had been effectively denied by the arbitrator's ruling on Bosse's termination grievance, the INS's final decision declined to rule on the merits of Bosse's leave restriction complaints, his claim of undue delay in processing the workers' compensation claim, and his claim that the INS wrongfully failed to give him FMLA leave.  INS denied Bosse's remaining claim, that the INS failed to give him a DFAIT card, because it lacked sufficient supporting evidence.

Bosse filed this lawsuit within three months following INS's final decision denying his complaints of discrimination based on disability.

II.  Cross-Motions for Summary Judgment

Bosse has filed a Motion for Partial Summary Judgment, and the Agency has responded with its own Motion for Summary Judgment.

Defendants' Motion for Summary Judgment asserts that they are entitled to judgment as a matter of law because Bosse failed to exhaust his administrative remedies as required by the Rehabilitation Act, 29 U.S.C. § 791.  Defendants assert that Bosse never contacted an EEOC counselor regarding his July 27,

13

2002, termination of employment and never filed a formal
complaint with the EEOC regarding his termination of employment.
Defendants also assert that Bosse failed to contact an EEOC
counselor within the requisite 45-day period regarding the
April 21, 2001, Leave Restriction Letter.  Instead, Bosse first
contacted an EEOC counselor on December 14, 2001.  The "EEO
Counselor Report" states that, on December 14, 2001, Bosse's
allegation of discrimination was as follows:

> Mr. Bosse believes that he is being discriminated
> against by being counseled on leave abuse and issued a
> Leave Restriction Letter on 4-21-01 when other
> employees have only been counseled on leave abuse and
> not issued a leave restriction letter.

(A-2 at 3.)

Bosse has asserted, somewhat vaguely, that he was made to
work overtime on December 2, 2001, in spite of a doctor's
instruction that he should not do so, and this lack of
accommodation of his disability was the subject of his
December 14, 2001, contact with the EEOC counselor.  However,
Bosse has not submitted any evidence, such as a doctor's note or
even his own affidavit, to support this allegation.  Bosse's
doctor's note instructing against overtime was written by Dr.

14

Jung on December 20, 2001, six days *after* Bosse had already contacted an EEO counselor. (Pl.'s S.J. Motion, Ex. 18 (Document 51-19).)  Bosse also asserts that perhaps on the same date, December 2, 2001, his supervisor, Becker, allegedly told Bosse that the doctor notes he was submitting were "bulls**t." (A-4 at 7.)  However, Becker's statement was not an adverse employment action.  Nor was it necessarily a statement reflecting any bias against Bosse; it may be that Becker was merely asserting that Bosse's medical certifications failed to meet the standard required by the April 21, 2001, Leave Restriction Letter.  An ambiguous statement such as this cannot qualify as an adverse employment action.

The lack of exhaustion of the alleged overtime complaint and the supervisor's allegedly discriminatory statement is shown by the letter of the INS notifying Bosse of receipt of his EEO Complaint. (A-16.)  The only issue presented by Bosse's EEO Complaint was this:  "Since April 21, 2001, you have been placed on leave restriction." (A-16.)  Significantly, Bosse did not reply to this April 24, 2001, letter from Director Diane Weaver, Office of Equal Employment Opportunity, even though her letter

15

instructed Bosse to notify her in writing within five days if Bosse believed that the issue had not been correctly identified. (A-16.)

No EEOC investigation was conducted regarding Bosse's complaints relating to December 2-3, 2001.  Instead, the EEOC's investigation focused on the April 21, 2001, Leave Restriction Letter and the subsequent requirement that Bosse present adequate medical certification of illness to justify his absences.  (A-4 at 4-7.)  All of these facts and circumstances are consistent with the conclusion that Bosse failed to exhaust his administrative remedies regarding the incidents alleged to have occurred on December 2-3, 2001.  Likewise, by failing to contact an EEO Counselor within 45-days of the alleged adverse employment actions, Bosse failed to exhaust his administrative remedies regarding the April 21, 2001, Leave Restriction Letter, the August 25, 2001 Suspension, and the July 27, 2002, termination from employment.

II.   Legal Standards.

     A.   For Summary Judgment Generally.   Summary judgment is
appropriate "if the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the
affidavits, if any, show that there is no genuine issue as to any
material fact and that the moving party is entitled to a judgment
as a matter of law."  Fed.R.Civ.P. 56(c).  To withstand a motion
for summary judgment, the nonmoving party must show "genuine
factual issues that properly can be resolved only by a finder of
fact because they may reasonably be in favor of either party."
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).


III. Relevant Statutes.

     Section 504 of the 1973 Rehabilitation Act or, more
formally, the Rehabilitation Act of 1973, Pub. L. No. 93-112, 87
Stat. 394 (Sept. 26, 1973), codified at 29 U.S.C.  § 701 et seq.,
is legislation that guarantees certain rights to people with
disabilities.  Section 504 is widely recognized as the first
civil-rights statute for workers with disabilities.  It took

17

effect in May 1977.  Because it was successfully implemented over
the next several years, it helped to pave the way for the 1990
Americans with Disabilities Act.

Section 504 of the Rehabilitation Act provides that "[n]o
otherwise qualified individual with a disability in the United
States, as defined in section 7(2) [29 U.S.C. § 705(20)], shall,
solely by reason of her or his disability, be excluded from the
participation in, be denied the benefits of, or be subjected to
discrimination under any program or activity . . . conducted by
any Executive agency or by the United States Postal Service."  29
U.S.C. § 794(a).  The same standards supplied by the Americans
with Disabilities Act of 1990, as can be applied to employment,
are to govern claims brought pursuant to the Rehabilitation Act.
29 U.S.C. § 794(d).  A federal employee alleging employment
discrimination based on race, color, religion, sex or national
origin is limited to the exclusive remedies under Title VII of
the Civil Rights Act of 1964, as amended.  *Brown v. Gen. Serv.
Admin.*, 425 U.S. 820 (1976).  Similarly, a federal employee
alleging a disability discrimination claim must utilize the
Rehabilitation Act as his sole recourse.  *Boyd v. United States*

*Postal Serv.*, 752 F.2d 410, 412-13 (9th Cir. 1985).

To make a *prima facie* case under the Rehabilitation Act, a plaintiff must show that he is:  (1) a person with a disability, (2) who is otherwise qualified for employment, and (3) who has suffered discrimination because of his disability.  *See Walton v. U.S. Marshals Service*, 492 F.3d 998, 1005 (9th Cir. 2007).  Proof of disability under the Rehabilitation Act requires a showing of (1) a physical or mental impairment that substantially limits one or more major life activities; (2) a record of such impairment; or (3) a perception of such impairment.  29 C.F.R. 1630.2(g); *see also Coons v. Sec. of U.S. Dept. of Treasury,* 383 F.3d 879, 884 (9th Cir. 2004).  Major life activities includes caring for oneself, walking, seeing, hearing, speaking, breathing, learning, and working.  45 C.F.R. § 84.3(j)(2)(ii).  Eating is also a major life activity.  *Fraser v. Goodale*, 342 F.3d 1032, 1041 (9th Cir. 2003) (ADA).  Diabetes mellitus is a physical impairment that can substantially limit a major life activity (depending on the impairment's nature, severity, duration, and impact).  *See Fraser v. Goodale*, 342 F.3d at ("brittle" Type I diabetic who cannot control her diabetes, even with thrice-daily blood testing,

19

strict diet, and insulin injections, raises genuine issue of material fact whether she is disabled under the ADA).

If plaintiff makes a *prima facie* case of disability discrimination under the Rehabilitation Act, the burden shifts to the employer to show that it had a nondiscriminatory reason for the employment action at issue.  If the employer makes such a showing, then the burden shifts back to the complainant to show that the employer's reason is pretextual.


IV.  <u>Failure to Exhaust Administrative Remedies.</u>

Administrative remedies with the EEOC must be exhausted before filing a Rehabilitation Act claim in district court. *Leorna v. U.S. Dep't of State*, 105 F.3d 548, 550 (9th Cir. 1997); *Vinieratos v. United States*, 939 F.2d 762, 773 (9th Cir. 1991). Because there is no statutory exhaustion requirement, however, the Court retains discretion to permit an unexhausted claim to go forward under certain circumstances, such as when there has been a waiver, or equitable estoppel or equitable tolling applies. *Leorna*, 105 F.3d at 550.

The same regulations pertinent to complaints of

discrimination and retaliation under Title VII (race, color, religion, sex, national origin) apply also to complaints under the ADEA (age), under the Rehabilitation Act (disability), and under the Equal Pay Act (wage discrimination).  29 C.F.R. § 1614.103(a).  The first requirement of exhaustion is that an "aggrieved person must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory." 29 C.F.R. § 1614.105(a)(1).  This permits the employer and employee an opportunity to informally resolve the dispute while the matter is still current and the workplace circumstances are relatively unchanged.  The 45-day period begins "when the facts that would support a charge of discrimination would have been apparent to a similarly situated person with a reasonably prudent regard for his rights."  *Boyd v. United States Postal Serv.*, 752 F.2d 410, 413-14 (9th Cir. 1985).  The second requirement is that after the pre-complaint processing is concluded (usually within about 30 days unless the employee agrees to a longer period) and a notice of right to file discrimination complaint is received by the employee, the employee must file a formal EEOC complaint within 15 days.  29 C.F.R. § 1614.106(b).

The doctrine of equitable tolling may be invoked when the
employee has neither actual nor constructive notice of the 45-day
requirement.  *See Leorna v. United States Department of State*,
105 F.3d 548, 551 (9th Cir. 1997).  Equitable estoppel may be
invoked when the defendant blocks the employee's ability to file
a timely claim by defendant's wrongful conduct.  *See Santa Maria
v. Pacific Bell*, 202 F.3d 1170, 1178 (9th Cir. 2000).

EEO regulations provide that an employee may request an
extension of the 45-day period for contacting an EEO counselor if
the employee shows (a) that he was not notified or was unaware of
the time limit, (b) he did not know that the discriminatory
action had taken place, or (c) he was prevented by reasons beyond
his control from contacting the EEO counselor.  Here, Bosse did
not request an extension of time from the EEOC, and no
justification for the delay appears in Bosse's pleading or
briefs.  In fact, Bosse was notified of the 45-day requirement
for contacting an EEOC counselor on August 13, 2001, when he
signed a Receipt of Director Thomas' Notice of Decision dated
August 9, 2001.  (A-6 at 5.)  This signature was witnessed.  This
notification of the 45-day requirement states:

22

> [S]hould you contend the disciplinary action effected
> was based in whole or in part on discrimination due to
> race, color, religion, national origin, sex, age or
> disability, your [sic] should consult a Service Equal
> Employment Opportunity Counselor **within forty-five (45)
> days of the effective date of your suspension.**
>
> You may appeal by arbitration or EEO, but by selecting
> one of the appeal options, you will be foreclosed from
> appealing via the other two options.

(A-6 at 5 (emphasis in original).)  Even if Bosse had no actual

or constructive notice of his 45-day deadline to contact an EEO

counselor about his April 21, 2001, Leave Restriction Letter, at

the time he received it, he certainly had been given actual

notice of the 45-day requirement by August 13, 2001.  His new and

extended deadline then would have been September 27, 2001.  Thus,

even with actual notice and assuming an extension of time to

contact the EEO counselor would have been granted by the INS,

Bosse had already missed the 45-day deadline by the time he made

his first EEO contact on December 14, 2001.

In addition to the actual notice of the 45-day deadline

provided to Bosse on August 13, 2001, Bosse received actual or

constructive notice by virtue of a notice placed at the

immigration inspectors' work place at the Calgary Airport.  (A-52

23

at 2, ¶ 5.)  A notice was posted on the bulletin board in the
inspectors' lunch room and secondary-inspection area.  (A-53 at
2, ¶ 6.)  Bosse received actual notice during his training at the
INS Academy at Glynco, Georgia, in 1997, where EEOC training
includes "informing the trainees at the Academy that an aggrieved
employee who believed he or she had been discriminated against .
. . must initiate contact with an EEO Counselor within 45 days of
the date of the matter alleged to be discriminatory."  (A-52 at
1, ¶ 3.)  Bosse also received actual or constructive notice of
his obligation to contact an EEOC Counselor within 45 days after
an incident of discrimination in the workplace by means of his
union contract, entitled "Agreement 2000 Between U.S. Immigration
and Naturalization Service and National Immigration and
Naturalization Services Council."  (A-52 at 2, ¶ 6.)  Finally,
Bosse had actual notice of the 45-day rule because INS informs
its employees in writing of the rule at the beginning of each
year.  (A-52 at 2, ¶ 4.)

Nevertheless, despite the notice posted at the workplace,
the annual written letter from the INS, the training at the INS
Academy, and the notice in the union contract, Bosse did miss the

45-day deadline for contacting an EEOC counselor after receiving
the April 21, 2001, Leave Restriction Letter.  Even after
receiving actual notice of the 45-day deadline on August 13,
2001, Bosse never requested an extension or attempted to contact
an EEO Counselor until almost 120 days later.  It therefore
appears without doubt that Bosse failed to exhaust his
administrative remedies as to the April 21, 2001, Leave
Restriction Letter, the August 25, 2001 Suspension, and also, and
quite explicitly, as to the July 27, 2002, termination of
employment itself, and that no equitable tolling argument
applies.

Bosse explicitly abandoned the possibility of an EEOC claim
regarding his termination when, on August 23, 2002, he informed
the EEOC that he wanted to use the union grievance procedure to
directly challenge his termination.  (A-15.)

The Court rejects Bosse's equitable estoppel argument based
on the fact that an employee of the Dallas EEO office told him
that he could seek reinstatement as a remedy for his EEO claim
while still formally challenging his termination through the
union grievance procedure.  Bosse was adequately informed that he

25

hade to make a choice between the EEO procedure and the union procedure, and he made his choice.  No action by the Dallas EEO representative blocked him or unfairly encouraged him to choose the union grievance procedure.  In fact, at the time of the alleged conversation with the Dallas EEO representative on August 22, 2002, Bosse had already made the choice by filing his union grievance on August 15, 2002.  (A-23.)  Bosse's election to utilize the union grievance procedure, once made, was irrevocable.  5 U.S.C. § 7121(d); 29 C.F.R. § 1614.301(a).

Thus, Bosse's claims in paragraph 28(A)[2], (B)[3], (D)[4], (E)[5],

---

[2]  "A.  Making offensive and unwelcome statements about the Plaintiff's disability or impermissibly perceived disability."

[3]  "B.  Placing Plaintiff on AWOL status for absences as a result of his absence from work due to his medical condition."

[4]  "D.  Placing Plaintiff on suspension due to his disability or impermissibly perceived disability."

[5]  "E.  Terminating Plaintiff's employment due to his disability or impermissibly perceived disability when the Plaintiff was fully qualified for the job, was able to perform all the essential functions of his job without reasonable accommodation or with reasonable accommodation for doctor appointments and necessary absences due to his disability, and should have been retained in the position he occupied at the time of termination."

(F)[6], (G)[7], and paragraph 27[8] of the Amended Complaint are all
unexhausted.  They were neither investigated by the EEO nor
considered in the Agency's Final Decision.


V.    Rehabilitation Act Claim (Count I).

      To the extent that any part of Bosse's disability claim has
been exhausted administratively, the Court determines that the
disability claim is without merit.

      A.  Bosse cannot prove disability.

      Bosse was diagnosed with Type II Diabetes in early
September, 2001.  In early October, Bosse's physician, Dr.
Manfred Hackemann, noted that Bosse had responded quickly,
although not completely or perfectly, to medication.  (A-37.)
Three months after diagnosis, however, on December 12, 2001, Dr.

---

      [6] "F.  Alleging a pretextual reason for the Plaintiff's
discharge."

      [7] "G.  Failing and refusing to take affirmative action to
correct the effect of the discriminatory policies and practices
complained of herein."

      [8] "27.  Defendant intentionally, knowingly, and willingly
engaged in illegal employment practices and policies which have
discriminated against Plaintiff because of his disability or
impermissibly perceived disability."

27

Hackemann noted that Bosse's diabetes was under "quite good control" and even that "[t]his man is doing well...." (A-29.) Even Bosse himself must have thought he was doing quite well physically, as in October, 2001, he still planned to take his annual hunting vacation in November, despite his diabetes. (That annual vacation was cancelled by INS due to work scheduling issues arising after a terrorist attack on the World Trade Center in September, 2001.)  Bosse presents no evidence that his diabetes was in any way uncontrolled such that it substantially limited a major life activity. *See Sutton v. United Air Lines*, 527 U.S. 471, 482 (1999) (plaintiffs not disabled when mitigating measures effectively treat underlying impairment without side effects or other burdens).  Bosse simply fails to show that his diabetes substantially limited any major life activity.  No record evidence supports this test for disability, and there is evidence in the record that Bosse has exaggerated his physical and mental symptoms in order to appear to be disabled.  (A-33 at 35-36 (Depo. Dr. Paul Darlington, psychiatrist).)  Dr. Darlington began to treat Bosse one year after he was fired by INS, but Dr. Darlington's perceptions are still quite relevant:

28

> I saw him over a number of months, almost a year.  At
> no time did I have the sense that he was disabled.  At
> no time did I feel that he had a psychiatric
> disability.  He, at one point, asked me to write a
> letter saying he was disabled because he could not
> complete his paperwork in his various legal pursuits.
> I refused to do so, and he ultimately did the task
> anyway.  He has a – from the history, he's fairly
> litigious oriented, and that's one indicator that a
> malingering diagnosis would be more in the cards.  And
> I did not get the sense that he had a somatoform
> [psychiatric] disorder as the months went by; that is,
> he was not preoccupied with his bodily functioning."

Bosse has attempted to supplement his claim of disability as to diabetes with claims that he suffered from stress, depression, and gout.  However, none of these conditions, alone or in combination with each other and the diabetes, rises to the level of limiting any major life activity.  Although Bosse went to many treatment providers to build his case against the INS, significantly, no treatment provider could state that Bosse was disabled by any condition, be it diabetes, depression, stress, carpal tunnel syndrome, or gout.

B.  Bosse cannot prove a record of disability.

The Leave Restriction Letter that is the subject of Bosse's EEOC complaint was issued four months before Bosse was diagnosed with diabetes.  Thus, Bosse presents no evidence that he had

established a record of disability with the INS prior to the
employment action of which he complains.  No record evidence
supports this test for disability.

C.  Bosse has not proved a perception of disability.

Neither does Bosse present evidence that the INS had the
perception that he had a disability at the time the Leave
Restriction Letter was issued on April 21, 2001.  To the
contrary, one of the goals of the Leave Restriction Letter was to
require Bosse to justify the use of his sick leave by means of
medical certificate of illness.  Implicit in the Leave
Restriction Letter was the suggestion that perhaps Bosse was not
ill, disabled, or impaired such as would justify his use of sick
leave.  No record evidence supports this test for disability.

D.  INS has submitted non-Discriminatory Reasons for
    Employer Action, and Bosse has failed to show pretext.

Defendants have submitted ample non-discriminatory reasons
for their employment actions.  The INS tried to work with Bosse
and required only that he follow prescribed paperwork and
procedures for using sick leave.  Bosse adamantly refused to
follow these INS procedures.  Bosse did not come to work when he
was expected to work.  Bosse refused to provide the INS with the

30

medical certificates substantiating his illnesses.  Moreover, and finally, Bosse simply quit coming to work.

In response to the INS's non-discriminatory reasons for their employment actions, Bosse fails to rebut with a showing that Defendants' nondiscriminatory reasons are pretextual.

VI.   Breach of Contract Claim (Count II) and Promissory Estoppel Claim (Count III).

Neither Count II nor Count III states claims upon which relief can be granted.  The Rehabilitation Act is Bosse's exclusive remedy for claims of disability discrimination.  *Boyd v. U.S. Postal Service*, 752 F.2d 410, 412-13 (9th Cir. 1985).

VI.   Other Pending Motions.

Finally, there are two motions to strike filed by Bosse against the Declarations of Alan Pucket (Deputy District Director, INS Helena Office), Dennis Garner (Area Port Director, INS, Calgary, Alberta, Canada), and Keith Becker (INS Supervisory Immigration Inspector, Calgary International Airport).  The Court finds that the motions to strike are without merit because the

31

Declarations of these INS officials are based upon the personal knowledge of these individual INS employees, each of whom was intimately involved with Bosse's work as an immigration inspector from 1997 to 2002.  It is only fair that the three men who supervised Bosse, and who were intimately involved in deciding to issue the Leave Restriction Letter, to suspend Bosse, and to terminate his employment, be allowed to state their opinions and beliefs regarding the matters alleged by Bosse, and therefore the Court will not strike their declarations.

VII. <u>Conclusion.</u>

        The Court finds that there are no genuine issues of material fact to be tried and that Plaintiff has failed to exhaust his administrative remedies as to the disability discrimination claims stated in the Amended Complaint's Paragraphs 27 and 28(A), (B), (C), (D), (E), (F), and (G).  On the merits, the Court finds further that Plaintiff has failed to show either that his illness satisfied the requirements for a disability under the Rehabilitation Act or that Defendants' nondiscriminatory reasons for the employment actions were pretextual.

Accordingly,

IT IS HEREBY ORDERED that Plaintiff's Amended Motion for Partial Summary Judgment is DENIED.

IT IS FURTHER ORDERED that the Federal Defendants' Motion for Summary Judgment is GRANTED.  The Amended Complaint is DISMISSED, and all relief is denied to Plaintiff.

IT IS FURTHER ORDERED:

1.  Plaintiff's "Motion to Strike Portions of Exhibits A-43, A-44, and A-45" is DENIED.
2.  Plaintiff's "Motion to Strike Portions of Exhibits A-52 and A-53" is DENIED.

Let judgment enter.

The Clerk is directed to notify the parties of entry of this order.

DATED this 31st day of March, 2008.


CHARLES C. LOVELL
SENIOR UNITED STATES DISTRICT JUDGE